UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    )
                           )
        v.              )    Criminal No.  04 CR 10220 MLW
                           )
YVELISSE GONZALEZ RODRIGUEZ )

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S
## MOTION TO SUPPRESS

### I.   INTRODUCTION

The Defendant, Yvelisse Gonzalez Rodriguez ("Rodriguez),
smuggled approximately 585 grams of heroin into the United States
inside of her alimentary canal on May 21, 2004.  Rodriguez now
moves to suppress the heroin that was seized after a border
search that included her voluntary consent to an X-Ray and a
subsequent monitored bowel movement on the grounds that Customs
Inspectors did not have reasonable suspicion to stop her as she
entered the country at Logan International Airport and that her
consent to the X-ray was not "voluntary."  Both of the
defendant's claims are without merit.

The defendant's consent to the X-ray that revealed the
pellets within her alimentary canal was voluntary, given after
she read a consent form written in Spanish, her native language,
and had a Spanish-speaking Customs Inspector read the consent
form to her in Spanish.  Even if the consent was not voluntary,
the X-ray of the defendant and her detention for a monitored
bowel movement were supported by reasonable suspicion and

1

therefore, lawful border searches. Accordingly, the Court should deny the defendant's Motion to Suppress.

## II.  **FACTS**

On May 21, 2004, at approximately 1:30 a.m., the defendant arrived at Logan International Airport in Boston, Massachusetts, on Air Jamaica flight number 0049 from Montego Bay, Jamaica. Affidavit of Colleen McDermott, ¶¶ 4-5 ("McDermott Affidavit"). Along with the other passengers arriving on Flight 49, the defendant proceeded to the customs inspection area after disembarking from the plane. Id. Customs Inspector Colleen McDermott (Inspector McDermott), who was monitoring the primary checkpoint, observed that Rodriguez was traveling alone with only a carry-on bag and directed her to a secondary checkpoint where her bags would be X-rayed. Id. at ¶¶ 4-6. Because of the late hour of the flight and the limited number of Customs Inspectors on duty, Customs Inspectors were directing as many passengers as possible through this secondary checkpoint where their bags would be X-rayed. Id. at ¶ 4. Customs Inspector Thomas Harrington was monitoring this secondary checkpoint where passengers' baggage would be X-rayed. Id. at ¶¶ 4; Affidavit of Thomas Harrington, ¶4 ("Harrington Affidavit"). After Rodriguez was directed to this secondary checkpoint, Inspector Harrington inspected the one carry-on bag that Rodriguez had in her possession. Harrington Affidavit, ¶ 4. Inside this bag, Inspector Harrington observed

2

approximately 13 pairs of shoes of different sizes and clothes that still had the sales tags on them. Id. Inspector Harrington found the contents of Rodriguez's bag suspicious because these shoes and clothes were inconsistent with a trip for pleasure. Id. Inspector Harrington examined the defendant's Dominican passport and noticed that it had recently been issued on May 12, 2004. Id. at ¶ 5. He then examined the sales receipt she had for her ticket and observed that her return ticket to Boston had been issued in Curacao on May 20, 2004, the same date of her departure, and that she had paid a $100.00 change fee in cash, which indicated that she had changed her departure date. Id. Inspector Harrington became more suspicious of Rodriguez because Curacao is known as a source country for narcotics and a "staging ground for internal couriers," meaning a location where couriers ingest narcotics in order to smuggle them into the United States. Id. His suspicion was further heightened by the fact that Rodriguez had changed her return ticket, and paid cash for the change fee, because internal narcotics couriers often change their return tickets depending upon the success, or lack thereof, of ingesting the narcotics and often pay cash for their tickets to conceal the identity of the purchaser. Id. Inspector Harrington attempted to question Rodriguez, but was unsuccessful because she only spoke limited English. Id. at ¶ 6.

Inspector Harrington then asked Inspector McDermott to

3

assist him in questioning Rodriguez because Inspector McDermott can speak and understand Spanish. Id.; McDermott Affidavit at ¶ 8. Inspector Harrington showed Inspector McDermott Rodriguez's bag, passport and ticket, and she shared his suspicions. Harrington Affidavit, ¶ 7; McDermott affidavit, ¶ 7. Because of their shared suspicions, they decided to continue questioning Rodriguez and inspecting her belongings in the secondary examination room and escorted her with her luggage to that location. Harrington Affidavit at ¶ 7; McDermott Affidavit, ¶ 8. Once in the secondary examination room, Rodriguez stood on one side of a table and Inspector McDermott and Harrington were on the other side of the table. Harrington Affidavit at ¶ 8; McDermott Affidavit at ¶ 9. The Inspectors began looking through Rodriguez's bag again in more detail. In addition to the approximately 13 pairs of shoes in different sizes and clothes with sales tags still on them, Inspector McDermott noticed that there was no bathing suit or other clothing that would be normal attire for a trip to Jamaica or Curacao. McDermott Affidavit at ¶ 9. No narcotics were found in the bags. Harrington Affidavit, ¶ 8.

Inspector McDermott, who speaks and understands Spanish, began questioning Rodriguez in English, using Spanish at first only when Rodriguez claimed that she did not understand English. McDermott Affidavit at ¶ 10. Rodriguez was able to understand

4

and speak some limited English. Rodriguez told Inspector McDermott that she lived with her mother on Seaver Street in Dorchester, mispronouncing "Seaver Street." She stated that she had three children. Id. At ¶ 11.

Rodriguez became increasingly nervous during the questioning, avoiding eye contact with the Inspectors, chewing on her pen and tapping her feet. Id. At ¶ 12. Her answers to Inspector McDermott's questions were untrue and evasive. Id. at ¶¶ 12-18. For example, when Inspector McDermott asked Rodriguez the location she had traveled to, Rodriguez repeatedly stated Jamaica, never mentioning Curacao. Id. at ¶ 13. Ticket stubs in Rodriguez's possession, however, indicated that she had traveled to Curacao from Montego Bay on May 15, 2004 and traveled from Curacao to Montego Bay and from Montego Bay to Boston on May 20, 2004. Id. The purchase receipt for her return ticket also showed that she had changed her return date and paid a $100.00 cash fee in Curacao. Id. Rodriguez's passport was stamped in Curacao on May 15, 2004. Id. When Inspector McDermott told her she had gone to Curacao, however, Rodriguez denied that she had traveled to Curacao, repeatedly stating that she had been in Jamaica. Id.

Further, Rodriguez told Inspector McDermott that she had stayed at the San Miguel Hotel in Jamaica, but could not provide the address or even the street name on which the hotel was

located. Id. at 14. When asked what she did on her trip, she stated that she met her friend Pedro, but did not know his last name. Id. at ¶ 15. When asked for an explanation of the contents of her bag, particularly the numerous pairs of shoes, she could not provide any explanation. Id. at ¶ 16. When asked where she worked, Rodriguez stated that she worked at a check-cashing store, but could not provide the name of the store or the name of her employer. Id. at ¶ 17 . Rodriguez told Inspector McDermott that she had brought $500.00 with her on her trip. Rodriguez, however, had no money in her possession when she returned. Id. at ¶ 18. When asked how she was going to get home from Logan Airport, Rodriguez told inspectors that she was going to take a cab. When asked how she was going to pay the cab because she had no money, Rodriguez stated she was planning on having the cab wait outside her house while she went inside to get money. Id.

Given the defendant's evasive, misleading and some obviously false answers to Inspector McDermott's questions, Inspector McDermott and Harrington became increasingly suspicious that Rodriguez was an "internal courier," meaning that she was smuggling drugs within her alimentary canal. Id. at ¶ 19; Harrington Affidavit, ¶ 15. Inspectors McDermott and Harrington ran a TECS records search in the computer on Rodriguez and learned that she had been stopped by Customs Inspectors on

6

February 9, 2004 at JFK International Airport in New York when returning from a trip to St. Maarten, also a source country for narcotics being smuggled into the United States. McDermott Affidavit, ¶ 20; Harrington Affidavit, ¶ 12. The records stated that Rodriguez had "spent four days in [St. Maarten] hotel; changed return ticket and paid penalty; cash ticket purchased few days prior to travel; [passenger] stated she did not like the island and decided to come home early." McDermott Affidavit, ¶ 20; Harrington Affidavit, ¶ 12. Inspector McDermott and Harrington became even more suspicious that Rodriguez was an internal courier of narcotics because of this recent trip to another source country for narcotics smuggling and the similarity between the timing and means of purchasing her tickets during that trip and her trip to Curacao from which she was now returning. McDermott Affidavit, ¶ 20; Harrington Affidavit, ¶ 12. For both trips, she had purchased cash tickets, stayed only for a short time, and changed her return flight paying a cash penalty. McDermott Affidavit, ¶ 20; Harrington Affidavit, ¶ 12.

Inspectors performed an additional TECS search in the computer on a telephone number, 461-2988, that Rodriguez had in her possession. McDermott Affidavit, ¶ 21; Harrington Affidavit, ¶ 13. TECS records showed that this number was connected to a possible heroin link, meaning that this number had come up in a previous investigations of heroin being smuggled into the United

7

States.  McDermott Affidavit, ¶ 21; Harrington Affidavit, ¶ 13.

During the course of the questioning by Inspector McDermott
and search of the defendant's bags in the secondary examination
room and while the TECS records searches were being conducted,
the only Inspectors in the room with Rodriguez were Inspectors
McDermott and Harrington, and Inspector Caroline Tully when
Inspector Harrington would leave the room.  McDermott Affidavit,
¶ 22; Harrington Affidavit, ¶ 14.  At times, they would step
outside the doorway of the room, while always able to see
Rodriguez.  McDermott Affidavit, ¶ 22.  Rodriguez sat on a bench
located inside the room after initially being questioned standing
at the table.  McDermott Affidavit, ¶ 22.  The questioning of
Rodriguez, search of her bags and TECS searches took
approximately an hour.  McDermott Affidavit, ¶ 22; Harrington
Affidavit, ¶ 14.

Based on the foregoing information, Inspectors McDermott
and Harrington, suspected that Rodriguez was smuggling narcotics
into the United States inside of her alimentary canal.  McDermott
Affidavit, ¶ 23; Harrington Affidavit, ¶ 15.  Consequently,
Inspector McDermott, in the presence of Inspector Tully, informed
Rodriguez that they suspected her of being an internal courier,
which Inspector McDermott described as "carrying narcotics inside
your stomach."  McDermott Affidavit, ¶ 26.  Inspector McDermott
told Rodriguez that they wanted to take her to a hospital in

8

order to perform an X-ray to determine if she had narcotics in her body and provided her with a consent form written in Spanish for her to read. Id. Rodriguez read the consent form. Inspector McDermott also read the consent form in Spanish to the defendant. Id. After she had read the form and Inspector McDermott had read it aloud to her, Rodriguez signed the form and printed her name beneath her signature. Id. Inspector McDermott recorded the time that Rodriguez signed the consent form, 3:57 a.m., and signed the form; Inspector Tully also signed the form. Id. The following is the English translation of the pertinent language of the Spanish consent form signed by Rodriguez: "I, the undersigned, hereby consent to X-ray examination of my body by a medical facility and/or an X-ray facility designated by the United States Customs and Border Protection. If female, I further consent to a pregnancy test prior to undergoing any X-ray examination. . . . I understand that I have the right to refuse such consent and acknowledge that my consent is freely given and is not the result of any threats, coercion, or other intimidation." Id. at ¶ 27.

After obtaining Rodriguez's consent, the Inspectors contacted their supervisor Inspector Bernard Der to obtain permission to transport Rodriguez to the hospital for a medical procedure. Id. at ¶ 30; Harrington Affidavit, ¶ 18. Customs policy and procedures require that the Port Director authorize

9

the transportation of a passenger to the hospital for an X-ray. McDermott Affidavit, ¶ 30; Harrington Affidavit, ¶ 18.  Inspector Der obtained the Port Director's approval and reported that to Inspectors McDermott and Harrington. McDermott Affidavit, ¶ 30; Harrington Affidavit, ¶ 18.  Thereafter, Rodriguez, accompanied by Inspector McDermott and Tully, was transported to the Whidden Memorial Hospital in Everett, Massachusetts at approximately 5:06 a.m. McDermott Affidavit, ¶ 31; Harrington Affidavit, ¶ 19.  They arrived at the hospital at approximately 5:24 a.m. and an X-ray of Rodriguez was performed at approximately 5:55 a.m.  McDermott Affidavit, ¶ 31.  The X-ray showed that Rodriguez had multiple foreign bodies in her alimentary canal.  Id.  Rodriguez was thus detained at the hospital for a monitored bowel movement.  At approximately 7:03 a.m., Rodriguez secreted 17 pellets from her body during a monitored bowel movement.  Id. at ¶ 34.  A field test performed on the substance contained in one of these pellets tested positive for heroin.  Id. at ¶ 34.  From 7:03 a.m. until 5:45 p.m., Rodriguez excreted a total of 60 pellets from her body.  Id. at ¶ 34.  Subsequent laboratory analysis of the substance within these pellets revealed that approximately 585 grams of heroin were contained inside these pellets and smuggled into the country by Rodriguez.  Id. at ¶ 35.

During the medical procedures and X-ray conducted at the hospital, Rodriguez was fully cooperative with the Customs

10

Inspectors and the medical personnel at the hospital.  Id. at ¶ 32.

## II.  ARGUMENT

### A.  DEFENDANT RODRIGUEZ VOLUNTARILY CONSENTED TO THE X-RAY THAT SHOWED THE HEROIN PELLETS WITHIN HER BODY

Defendant Rodriguez concedes that on May 21, 2004, she signed a consent form, giving her consent to an X-ray of her body.  Defendant now claims, however, that her consent was not voluntary.  The defendant makes no allegation that the Customs Inspectors acted improperly or engaged in any threatening, coercive or otherwise improper behavior to force her to give her consent and sign the consent form.  Rather, the defendant claims only that she "signed the X-ray consent form surrounded by a myriad of uniformed, English-speaking, government officials, after she had been held for two and a half (2 ½) hours" and "felt forced to sign the consent form in a coercive environment in which she was afraid and vulnerable."[1]  Defendant's claims that the environment was coercive and that she was surrounded by "a myriad" of English-speaking officials are simply untrue and unsupported and contrary to the Affidavits of Inspectors McDermott and Harrington.  The written consent form, signed by the defendant, the circumstances under which the consent was obtained, and the behavior of the defendant, demonstrate that her

---

[1] These assertions in the Defendant's Motion to Suppress are unsupported by any Affidavit of the Defendant.

11

consent was voluntary.

Under the Fourth Amendment, unless a search by a government agent falls within an established exception, it must be conducted pursuant to a warrant based upon probable cause. <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973). One such established exception to the requirement of probable cause and a warrant is a search that is conducted with an individual's consent. <u>Id</u>.; <u>United States v. Forbes</u>, 181 F.3d 1, 5 (1st cir. 1999). In order for this exception to apply, the government must prove by a preponderance of evidence that the consent was voluntary. <u>Forbes</u>, 181 F.3d at 5.

Voluntariness of consent is a question of fact that must be determined based upon an assessment of the totality of the circumstances. <u>Schneckloth</u>, 412 U.S. at 248-249; <u>United States v. Barnett</u>, 989 F.2d 546, 554-555 (1st cir. 1993)(citing <u>United States v. Mendenhall</u>, 446 U.S. 544, 557 (1980)). The factors to be considered in determining whether an individual's consent was voluntary include the consenting party's age, education, intelligence, and knowledge of the right to withhold consent, as well as whether permission to search was obtained by coercive means or under inherently coercive circumstances and whether the consenting party was advised of his or her constitutional rights. <u>Forbes</u>, 181 F.3d at 5; <u>Barnett</u>, 989 F.2d at 555; <u>United states v. Coraine</u>, 198 F.3d 306, 309 (1st cir. 1999).

The totality of circumstances surrounding Rodriguez giving her consent for an X-ray to be conducted at the hospital compels the conclusion that her consent was voluntary. On May 21, 2004, Defendant Rodriguez was a 28 year old woman, who appeared to Inspector McDermott to be of average intelligence based upon her understanding of and responses to Inspector McDermott's questions. See McDermott, ¶ 29. Although her understanding of English was limited, when Inspector McDermott conversed with her in Spanish, Rodriguez was able to understand and respond to the questions of Inspector McDermott, albeit in an evasive manner. Her intelligence is further supported by the fact that she stated that she worked at a check-cashing business, despite the fact that she claimed she could not speak English.

When Inspector McDermott requested Rodriguez to consent to the X-ray, only Inspectors McDermott and Tully, both female, were present with Rodriguez in the room. Inspector McDermott gave Rodriguez the consent form, which was written in Spanish, to read for herself. Inspector McDermott also assisted Rodriguez in understanding the consent form by reading it aloud to her. Thus, Rodriguez both read for herself and had read to her in Spanish the following words of the consent form: "I understand that I have the right to refuse such consent and acknowledge that my consent is freely given and is not the result of any threats, coercion, or other intimidation." Rodriguez was thereby informed

13

of her right to refuse to give consent and she acknowledged that
she was giving her consent freely and that it was not being
obtained by threats, coercion or other intimidation. Rodriguez
signed her name on the form in cursive writing and in print,
evidencing some education and the voluntariness of her actions.
Clearly the circumstances surrounding Rodriguez giving her
consent in writing to the X-ray compel the conclusion that her
consent was voluntary.

Contrary to her assertions, Rodriguez was not surrounded by
a myriad of officers who only spoke English. Only Inspector
McDermott and Tully were present when her consent was obtained
and Inspector McDermott speaks Spanish. The defendant's claim
that the environment was coercive is similarly unsupportable.
Although Rodriguez was detained by officers from approximately
1:50 a.m. when she was initially stopped at the secondary
examination checkpoint until she signed the consent form at 3:57
a.m., only three Customs Inspectors interacted with her, two of
whom were female and one of whom spoke Spanish. These Customs
Inspectors did not coerce, threaten, force, intimidate or harrass
Rodriguez in any way, and Rodriguez does not allege that they
did. They simply searched her luggage, asked her questions, and
performed computer checks on her information. The mere presence
of these officers in uniform did not create an inherently
coercive environment.

14

Moreover, although approximately two hours passed while Inspectors McDermott and Harrington were interacting with Rodriguez, the inspectors were not questioning Rodriguez and searching her bags continuously during these two hours. The initial interaction occurred in the general screening area where other passengers were being inspected. Rodriguez was thereafter taken to the Secondary Examination Room where she was questioned and her bags further searched by Inspectors McDermott and Harrington, but during much of this time, Rodriguez was sitting on a bench in the room while computer checks were being conducted. There was nothing coercive about the environment or the Inspectors' behavior to make her written consent involuntary. The mere fact that she was detained is not enough to render her consent involuntary. As the Supreme court has stated regarding consent obtained from an individual in custody, "custody alone has never been enough in itself to demonstrate ... coerced ... consent to search." United States v. Watson, 423 U.S. 411, 424 (1976); Barnett, 989 F.2d at 555; Forbes, 181 F.3d at 5.

Finally, Rodriguez's behavior during the Customs inspection, the ride to the hospital, and at the hospital was cooperative and consistent with the conclusion that her consent was voluntary. If Rodriguez did give her consent because she felt coerced and afraid in the allegedly coercive environment at the airport, as she claims, one would expect her to feel less intimidated at the

15

hospital, where medical personnel were present, and take some action to withdraw her consent. Yet, even at the hospital, where medical personnel were present and she could have voiced her objection, Rodriguez continued to cooperate and facilitate the medical procedures, including the X-ray. Her behavior was consistent with an individual who voluntarily consented to have her X-ray taken.

Accordingly, the circumstances surrounding Rodriguez giving her written consent to an X-ray, the fact that there was no coercive, threatening, or intimidating behavior by the Customs Inspectors, and Rodriguez's own cooperative behavior, compel the conclusion that her consent to search was given voluntarily. This Court should thus deny defendant's Motion to Suppress.

**B.    REASONABLE SUSPICION EXISTED TO CONDUCT AN X-RAY WITHOUT RODRIGUEZ'S CONSENT AND TO DETAIN HER FOR A MONITORED BOWEL MOVEMENT**

Even if Rodriguez's consent to the X-ray was involuntary and therefore invalid, the X-ray and the detention of Rodriguez for a monitored bowel movement were supported by reasonable suspicion that she was smuggling drugs inside of her alimentary canal. See Affidavits of McDermott and Harrington. As such, they were legal searches and this Court should deny the defendant's Motion to Suppress the evidence, namely the heroin excreted from Rodriguez's body, that was recovered as a result of these searches.

16

It is well settled that routine border searches of the persons and effects of entrants to the United States are not subject to any requirement of reasonable suspicion, probable cause or a warrant. United States v. Montoya de Hernandez, 473 U.S. 531, 538 (1985); United States v. Beras, 183 F.3d 22, 25-26 (1st Cir. 1999); United States v. Robles, 45 F.3d 1, 5 (1st Cir. 1995); United States v. Braks, 842 F.2d 509, 511 (1st Cir. 1988). The standard applicable to routine border searches is "no suspicion," which mean that a Customs Inspector may conduct a routine search of an individual at the border without any suspicion, based upon subjective suspicion alone, or even on a random basis. United States v. Uricoechea-Casallas, 946 F.2d 162, 166 (1st Cir. 1991); Braks, 842 F.2d at 514-515. Contrary to defendant's assertion that "reasonable suspicion" was required before she could be stopped as she entered the country, Customs Inspectors required "no level of suspicion" to conduct a routine border search of Rodriguez, which included stopping and questioning her and searching her luggage and effects. Customs Inspectors' stop of Rodriguez as she entered the Customs area and their subsequent questioning of her and search of her bags were lawful as part of a routine border search.

Border searches that are non-routine, however, require reasonable suspicion before they may lawfully be conducted. Robles, 45 F.3d at 5; Braks, 842 F.2d at 514. To satisfy the

17

reasonable suspicion standard, agents must "demonstrate some objective, articulable facts that justify the intrusion as to the particular person and the place searched." Robles, 45 F.3d at 5; Uricoechea-Casallas, 946 F.2d at 166. Whether a search is a routine or non-routine depends upon the degree of invasiveness or intrusiveness of the search. Braks, 842 F.2d at 511. The First Circuit has identified factors to be used in determining what degree of invasiveness or intrusiveness would render a border search non-routine. Id. at 511-513; Robles, 45 F.3d at 5.

The detention of an individual at the border for a monitored bowel movement has been held by the Supreme Court to be a non-routine border search requiring reasonable suspicion. Montoya de Hernandez, 473 U.S. at 541 (detention of traveler at the border for 16 hours for a monitored bowel movement based upon reasonable suspicion held to be a lawful search). As the supreme Court held in Montoya de Hernandez, "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." Accordingly, detaining an individual for a monitored bowel movement, as both Rodriguez and the defendant in Montoya De Hernandez were, is considered to be a non-routine customs search that will be justified if Customs Inspectors have

18

reasonable suspicion that the individual is smuggling contraband in her alimentary canal.

The Supreme Court did not decide what level of suspicion was required for other non-routine border searches, such as strip, body cavity or involuntary X-ray searches, although they did refer to these searches as "non-routine." Montoya de Hernandez, 473 U.S. at 541, FN 4. Since Montoya de Hernandez, however, Courts of Appeals have applied the same standard of reasonable suspicion to border searches that are found to be non-routine. See Braks, 842 F.2d at 512-515. Although strip and body cavity searches have consistently been held to be non-routine searches requiring reasonable suspicion, see Braks, 842 F.2d at 512-513, few courts have addressed whether an involuntary X-ray is a non-routine search requiring reasonable suspicion. See United States v. Agebor, 166 F.3d 1210, 1999 WL 5110, *3 (4th Cir. 1999)(unpublished opinion). Assuming, however, that an involuntary X-ray, which requires a medical procedure, is a non-routine customs search, reasonable suspicion that an individual is smuggling contraband inside her alimentary canal would be required before such a search could lawfully be conducted. See Robles, 45 F.3d at 5; Braks, 842 F.2d at 514.

In the instant case, Customs Inspectors McDermott and Harrington had reasonable suspicion, based upon objective and articulable facts, that Rodriguez was an internal courier,

19

smuggling contraband into the country inside of her alimentary
canal.  First, Rodriguez's travel itinerary raised the suspicions
of the Customs Inspectors.  Rodriguez traveled to Curacao, a
source country for narcotics being smuggled into the United
States and particularly known to Customs Inspectors as a location
where narcotics smugglers ingest heroin before bringing it into
the United States.  Rodriguez's Dominican passport was only
issued three days prior to her travel, a common practice of
narcotics smugglers.  Rodriguez's trip was a short one and she
changed her return flight, paying $100.00 change fee in cash in
Curacao on May 20, 2004, the date of her departure.  Changing the
return flight is known by the Customs Inspectors to be a common
practice of internal narcotics couriers because the ingestion
process is unpredictable.  Also, narcotics couriers typically pay
for their plane tickets in cash to conceal the identity of the
purchaser.

     Second, the contents of Rodriguez's bag was inconsistent
with a pleasure trip to Curacao.  The bag contained approximately
13 pairs of shoes in different sizes and clothes that still had
the sales tags on them.  The bag did not contain any clothing
that would be normal for a trip to Curacao or Jamaica.  When
asked about the unusual contents of her baggage, Rodriguez did
not provide any explanation.

     Third, during the inspection and questioning, Rodriguez

became increasingly nervous, avoiding eye contact, tapping her feet and chewing on her pen. Additionally when questioned by Inspector McDermott, Rodriguez was evasive and gave misleading and even false information. For example, although her passport, ticket stubs, and ticket sales receipt evidenced that she traveled to Curacao, Rodriguez denied that she did, repeatedly insisting she had been in Jamaica. She claimed that she had stayed at the San Miguel Hotel, but did not know where it was located. She also claimed she met her friend "Pedro" in Jamaica, but did not know his last name. She similarly claimed ignorance of the name of the check-cashing store where she worked and the name of her employer. She also had no money in her possession, presumably spending her last $100.00 to change her return flight, yet claimed that she planned to take a taxi cab home to Dorchester from the airport.

Fourth, TECS computer searches revealed information that she had traveled in February 2004, only three months prior, to St. Marten, another source country for narcotics being smuggled into the United States. Additionally, her travel itinerary for that trip, as revealed by information obtained by Customs Inspectors when she was stopped at JFK International Airport on February 9, 2004, was similar to her trip to Curacao. She stayed at a hotel for four days in St. Maarten, changed return ticket to come back early and paid a penalty, and purchased her ticket with cash a

21

few days prior to travel - all indicators that she might be a narcotics smuggler, particularly because she repeated the pattern on her trip to Curacao.  Finally, a telephone number found in Rodriguez's possession was checked in the TECS database and determined to be linked to an investigation regarding the smuggling of heroin into the United States.

Based upon the foregoing facts, information and observations, Inspectors McDermott and Harrington suspected that Rodriguez was smuggling narcotics inside her alimentary canal. Their suspicion was reasonable.  Given this reasonable suspicion, the X-ray of Rodriguez that revealed foreign bodies inside her, and the detention of Rodriguez for 5 ½ hours for a monitored bowel movement that occurred at 7:03 a.m. and by which she excreted pellets of heroin from her system, were both lawful searches.  Accordingly, the Court should deny the Defendant's Motion to Suppress.

## CONCLUSION

Based upon the foregoing, the Government respectfully requests this Court to deny the Defendant's Motion to Suppress the heroin seized as a result of the X-ray and monitored bowel movement of the defendant.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:

Maureen B. Hogan
Assistant U.S. Attorney

Dated: December 23, 2004

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon Ronald Ian Segal, Esq., counsel for the defendant, a copy of the foregoing document by mail.

This 23rd day of December, 2004.

Maureen B. Hogan
Assistant U.S. Attorney

23