UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )   Criminal No. 04 CR 10220 MLW
)
YVELISSE GONZALEZ RODRIGUEZ )

## AFFIDAVIT OF THOMAS HARRINGTON

I, Thomas Harrington, a Customs Officer with Customs and Border Protection, being duly sworn, states:

1. I have been employed as a Customs Inspector with United States Customs and Border Protection, and prior thereto with the United States Customs Service, since 1995.

2. On May 20, 2004, I worked the 4:00 p.m. to midnight shift at Logan Airport and worked into the early morning hours of May 21, 2004 on overtime.

3. At approximately 1:30 a.m., Air Jamaica Flight 49 arrived at Logan International Airport from Montego Bay, Jamaica. I and other Inspectors were assigned to observe and screen the passengers who arrived on that flight and were entering the country.

4. While I was monitoring passengers as they were inspected at the agriculture secondary checkpoint where their baggage would be X-rayed, Yvelisse Gonzalez Rodriguez was directed to this secondary checkpoint. Ms. Rodriguez had one carry-on "Bon Jour" bag and a pocketbook. After her bags were X-rayed, I began to inspect the bags of Ms. Rodriguez. Inside her carry-on bag, I observed approximately 13 pairs of shoes of different sizes and clothes that still had the sales tags on them. I found the contents of Rodriguez's bag suspicious because these shoes and clothes were inconsistent with a trip to Jamaica, where she had arrived from.

5. I examined Ms. Rodriguez's Dominican passport and noticed that it had recently been issued on May 12, 2004 and that it had been stamped in Curacao on May 15, 2004, indicating that her passport had been issued only three days before her departure. Based on my experience and training, I know that recently issued passports are often used by individuals smuggling narcotics into the country in order to hide previous travel and show that the international travel was not planned. I then examined the purchase receipt that Ms. Rodriguez had for her ticket and observed that her return ticket to Boston had been issued in Curacao on May 20, 2004, the same date of her departure, and that she had paid a $100.00 change fee in cash to change her departure flight. I became even more suspicious of Ms. Rodriguez because Curacao is known as a source country for narcotics being smuggled into the United States and a "staging ground for internal couriers," meaning a location where couriers ingest narcotics in order to smuggle them into the United States. My suspicion was further heightened by the fact

that Rodriguez had changed her return ticket and paid cash for the change fee. Based on my experience and training, internal narcotics couriers often change their return tickets depending upon the success, or lack thereof, of ingesting the narcotics and narcotics smugglers also usually pay for their tickets in cash so the purchaser can not be traced.

6. I then attempted to question Ms. Rodriguez regarding her travel and the contents of her baggage, but she claimed that she did not speak English. I then requested Inspector Colleen McDermott to assist me in questioning Ms. Rodriguez because Inspector McDermott speaks and understands Spanish.

7. When Inspector McDermott joined me at the secondary inspection area, I showed her the contents of Ms. Rodriguez's bags, her passport and her purchase receipt for her ticket. Inspector McDermott stated that she shared my suspicions that Ms. Rodriguez might be smuggling narcotics into the country. We decided to proceed with the inspection inside of the secondary examination room and escorted Ms. Rodriguez to that room with her baggage.

8. Once in the secondary examination room, Ms. Rodriguez stood on one side of the table located in the room and Inspector McDermott and I stood on the other side of the table. We then began to look through the bag in more detail. No narcotics were found inside her bags.

9. Inspector McDermott then began to question Ms. Rodriguez, first in English and then in Spanish when Ms. Rodriguez claimed she did not understand. During the course of this questioning and inspection of Ms. Rodriguez's baggage, only Inspector McDermott and myself were present in the room.

10. Inspector McDermott told me the answers that Ms. Rodriguez was giving in response to her questions. The information given by Ms. Rodriguez was incomplete, misleading and appeared to be false. For example, Ms. Rodriguez insisted she had been in Jamaica when we knew from her documents that she had stayed in Curacao. Ms. Rodriguez gave us the name of the hotel she claimed to have stayed at in Jamaica, but did not know where it was located. Ms. Rodriguez said she visited a friend named "Pedro," but did not know his last name. Although she said she worked at a check-cashing store, she said she did not know the name of the store or her employer. Ms. Rodriguez also did not have any money in her possession for the taxi cab that she said she was planning on taking home from the airport.

11. During the questioning, Ms. Rodriguez appeared to be nervous and was chewing on her pen and tapping her feet.

12. As part of our inspection of Ms. Rodriguez, we ran a TECS records search in the computer on Ms. Rodriguez. TECS is a Customs database that contains information collected on individuals who are violators or suspected violators of Customs and related laws and information obtained during Customs inspections. The query regarding Ms. Rodriguez indicated that she had been stopped by Customs Inspectors on February 9, 2004 at JFK International Airport in New York when returning from a trip to St. Maarten. St. Maarten is also a source country for narcotics being smuggled into the United States. The records stated that Rodriguez

had "spent four days in [St. Maarten] hotel; changed return ticket and paid penalty; cash ticket purchased few days prior to travel; [passenger] stated she did not like the island and decided to come home early." I became even more suspicious that Rodriguez was an internal courier of narcotics because of her recent trip to another source country for narcotics smuggling and the similarity between the timing and means of purchasing her tickets during that trip and her travel to Curacao. For both trips, she had purchased cash tickets, stayed only for a short time, and changed her return flight paying a cash penalty.

13. In Ms. Rodriguez's bags, we found a piece of paper on which was written the telephone number, 461-2988. We performed an additional TECS search in the computer on this telephone number. TECS records showed that this number was connected to a possible heroin link, meaning that this number had come up in a previous investigation of heroin being smuggled into the United States.

14. During the course of our inspection of Ms. Rodriguez's bags and the questioning by Inspector McDermott, and while the TECS records searches were being conducted, the only Inspectors in the room with Ms. Rodriguez were myself and Inspector McDermott, and at times when I would leave the room, Inspector McDermott would be joined by Inspector Caroline Tully. The inspection of the bags, the questioning of Ms. Rodriguez and the TECS checks all took approximately 1 hour.

15. Based upon the information detailed above, including Ms. Rodriguez's travel itinerary, the fact that her passport was only issued three days before her trip, the contents of her baggage, the fact that no narcotics were found in her baggage, and did not appear to be hidden on her person, her nervous behavior and her evasive and some false answers to questions, combined with the results of the TECS searches, both I and Inspector McDermott suspected that Ms. Rodriguez was an "internal courier," meaning that she was smuggling drugs within her alimentary canal.

16. After forming this opinion, we contacted out Supervisor, Bernard Der, and informed him that we suspected that Ms. Rodriguez was an internal courier. Inspector Der authorized a pat down of Ms. Rodriguez's outer clothing and instructed us to ask Ms. Rodriguez to consent to an X-ray that would be conducted at the hospital.

17. Inspector McDermott accompanied by Inspector Tully obtained Ms. Rodriguez's consent in writing to the X-ray that would be performed at the hospital.

18. After Ms. Rodriguez consented to have an X-ray performed, we again contacted Inspector Der and obtained permission to transport Ms. Rodriguez to the hospital. Customs policy and procedures require that the Port Director authorize the transportation of a passenger to the hospital for any medical procedure, including an X-ray or monitored bowel movement. Inspector Der obtained the Port Director's approval and reported back to us that the transportation of Ms. Rodriguez was approved.

19. At approximately 5:06 a.m., Ms. Rodriguez was brought to the Whidden

Memorial Hospital in Everett, Massachusetts by Inspectors McDermott and Tully.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 23, 2004.

_____
Thomas Harrington
Customs Inspector
Customs and Border Protection