UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No. 04 CR 10220 MLW |
| ) | |
| YVELISSE GONZALEZ RODRIGUEZ ) | |

### AFFIDAVIT OF COLLEEN E. MCDERMOTT

I, Colleen E. McDermott, a Customs Officer with Customs and Border Protection, being duly sworn, states:

1. I have been employed as a Customs Inspector with United States Customs and Border Protection, and prior thereto with the United States Customs Service, since 2001.

2. From 1995 through 1999, I attended Westfield State College, where I majored in Spanish and Criminal Justice. During my junior year, I studied abroad in Spain. Prior to my employment as a Customs Inspector, I was employed as a substitute Spanish teacher for a period of approximately one year. I can speak, understand, read and write the Spanish language.

3. On May 20, 2004, I worked an evening shift at Logan Airport and worked into the early morning hours of May 21, 2004 on overtime.

4. At approximately 1:30 a.m., Air Jamaica Flight 49 arrived at Logan International Airport from Montego Bay, Jamaica. I and other Inspectors were assigned to observe and screen the passengers who arrived on that flight and were entering the country. I was assigned to the primary checkpoint and was responsible for observing the passengers who had disembarked from Flight 49 as they entered the customs area and directing them either to the secondary agricultural checkpoint where there was a baggage X-ray machine, to immigration, or through the Customs area into the airport. Given the late hour of Flight 49 and the fact that we were understaffed, we were directed to "blitz" the flight, which means that we would attempt to check the baggage of as many passengers as we were able.

5. At approximately 1:50 a.m., I observed Yvelisse Gonzalez Rodriguez enter the Customs inspection area, along with other passengers, after disembarking from Flight 49 from Jamaica. Ms. Rodriguez was seeking to enter the United States. When I first saw Ms. Rodriguez, she was wheeling a "Bon Jour" roller carry-on bag. I observed that she was a young woman who appeared to be traveling alone and who did not have any checked luggage.

6. I directed Ms Rodriguez to the agriculture secondary checkpoint to have her bags X-rayed. At that time, Customs Inspector Thomas Harrington was assisting the monitoring of this secondary checkpoint, where passengers' baggage was being X-rayed and further inspection

of passengers and their luggage was being conducted.

7. After approximately 15 minutes, Inspector Harrington summoned me to where he was inspecting the baggage of Ms. Rodriguez. Inspector Harrington showed me Ms. Rodriguez's passport, which had been recently issued on May 12, 2004 in Boston, Massachusetts. The passport was stamped in Curacao on May 15, 2004, showing that Ms. Rodriguez had obtained her passport only 3 days before her departure. Based on my experience and training, I know that recently issued passports are often used by individuals smuggling narcotics into the country to hide their previous travel. Recently issued passports also show that the international travel was not planned. Inspector Harrington also showed me the purchase receipt of Ms. Rodriguez's ticket which showed that it had been issued in Curacao on May 20, 2004, the departure date of Ms. Rodriguez's return flight to Boston, and that she had paid $100.00 in cash to change her return flight to May 20, 2004. Based on my experience and training, individuals smuggling narcotics in their alimentary canal often change their return dates because of the ingestion process. Narcotics smugglers also usually pay for their tickets in cash so the purchaser can not be traced. Additionally, Curacao is known as a source country for narcotics being smuggled into the United States and particularly as a location where narcotics are ingested before being smuggled into the United States. Inspector Harrington also showed me the contents of Ms. Rodriguez's carry-on bag, which contained approximately 13 pairs of shoes in different sizes and clothes with the sales tags still on them. Based on the contents of her bag, which were not normal for a trip to Curacao or Jamaica and did not contain much, if any clothing, for her trip, the short duration of her stay, the fact that she had a recently issued passport, had traveled to Curacao, a source country for narcotics smuggling into the United States, and paid $100.00 cash to change her return ticket, both I and Inspector Harrington suspected that she might be smuggling narcotics into the country.

8. Inspector Harrington and I agreed that we should continue the inspection of Ms. Rodriguez and her baggage in the Secondary Examination room. Inspector Harrington asked me to assist him in questioning Ms. Rodriguez because she claimed not to speak English and I could both speak and understand Spanish, her native language. We thereafter escorted Ms. Rodriguez to the Secondary Examination Room. I estimate that we arrived at the Secondary examination room with Ms. Rodriguez at approximately 2:20 a.m.

9. Once in the secondary examination room, Ms. Rodriguez stood on one side of the table located in the room and Inspector Harrington and I stood on the other side of the table. We then began to look through the bag in more detail. In addition to the approximately 13 pairs of shoes of different sizes and clothes with sales tags still on them, I noticed that there was no bathing suit or other clothing that would be normal attire for a trip to Jamaica or Curacao.

10. I began questioning Ms. Rodriguez. At first I spoke to her in English, using Spanish only when she claimed that she did not understand English. Based upon her responses to my questions, I believe that Ms. Rodriguez is able to understand and speak some limited English. Given her claim that she did not understand English, however, I began speaking to her in Spanish and she answered my questions in Spanish.

11. I asked Ms. Rodriguez where she lived and she said that she lived on Seaver Street in Dorchester, mispronouncing "Seaver Street" as something like "Seavess Street." I asked her who she lived with and she stated she lived with her mother. I asked her if she was married and she said she was not. I asked her if she had any children and she replied that she had three children.

12. As I continued to ask Ms. Rodriguez questions, I noticed that she became increasingly nervous during the questioning, avoiding eye contact with me, chewing on her pen and tapping her feet. She also began to give me answers that I knew to be untrue or that were evasive.

13. I asked her where she had traveled to and she repeatedly answered "Jamaica." Her passport, however, contained a stamp that showed she had entered Curacao on May 15, 2004. She also had in her possession a ticket stub that indicated she had traveled from Montego Bay to Curacao on May 15, 2004 and from Curacao to Montego Bay and Montego Bay to Boston on May 20, 2004. Additionally, her purchase receipt for her ticket to Boston was purchased in Curacao where she paid $100.00 to change her return flight. Ms. Rodriguez, however, continued to say that she had been in Jamaica. When I asked her if she had traveled to Curacao, she said "No. Jamaica."

14. I asked Ms. Rodriguez where she had stayed on her trip and she said she that she had stayed at the San Miguel Hotel in Jamaica. I asked her the address of the hotel, but she said she did not know. I asked her the name of the street the hotel was located on, but she said she did not know. I asked her to show me any paper she had from the hotel, but she did not have anything.

15. I asked Ms. Rodriguez what she did on her trip and she replied that she she met her friend "Pedro." I asked her Pedro's last name, but she stated that she did not know his last name.

16. I asked Ms. Rodriguez about the contents of her bag and why she had so many pairs of shoes in different sizes, but she did not give me any answer.

17. I asked Ms. Rodriguez if she was employed and she said that she was. I asked her where she worked and she said that she worked at a check cashing store. I asked her who her boss was and for the name of the store, but she said she did not know the name of the store or the name of her employer.

18. I asked Ms. Rodriguez how much money she brought with her on her trip and she said $500.00. I asked her how she planned on getting home from the airport and Rodriguez answered that she planned to take a taxi cab. I asked her how she was going to pay for a cab because she had no money in her possession and she said she was going to get the money when she arrived at her house.

19. Based upon her travel itinerary, the fact that her passport was only issued three

days before her trip, the contents of her baggage, the fact that no narcotics were found in her baggage and did not appear to be hidden on her person, combined with her nervous behavior and her evasive, misleading and some obviously false answers to my questions, both I and Inspector Harrington increasingly suspected that Ms. Rodriguez was an "internal courier," meaning that she was smuggling drugs within her alimentary canal.

20. As part of our inspection of Ms. Rodriguez, we ran a TECS records search in the computer on Ms. Rodriguez. TECS is a Customs database that contains information collected on individuals who are violators or suspected violators of Customs and related laws and information obtained during Customs inspections. The query regarding Ms. Rodriguez indicated that she had been stopped by Customs Inspectors on February 9, 2004 at JFK International Airport in New York when returning from a trip to St. Maarten. St. Maarten is also a source country for narcotics being smuggled into the United States. The records stated that Rodriguez had "spent four days in [St. Maarten] hotel; changed return ticket and paid penalty; cash ticket purchased few days prior to travel; [passenger] stated she did not like the island and decided to come home early." I and Inspector Harrington became even more suspicious that Rodriguez was an internal courier of narcotics because of her recent trip to another source country for narcotics smuggling and the similarity between the timing and means of purchasing her tickets during that trip and her travel to Curacao. For both trips, she had purchased cash tickets, stayed only for a short time, and changed her return flight paying a cash penalty.

21. In Ms. Rodriguez's bags, we found apiece of paper on which was written the telephone number, 461-2988. We performed an additional TECS search in the computer on this telephone number. TECS records showed that this number was connected to a possible heroin link, meaning that this number had come up in a previous investigation of heroin being smuggled into the United States.

22. During the course of our inspection of Ms. Rodriguez's bags and my questioning of her in the secondary examination room and while the TECS records searches were being conducted, the only Inspectors in the room with Rodriguez were myself and Inspector Harrington, and Inspector Caroline Tully when Inspector Harrington left the room. The inspection of the bags, my questions of Ms. Rodriguez and the TECS queries all took approximately 1 hour. During this time, I was not continuously questioning Ms. Rodriguez. When we were conducting the TECS queries, we at times would step outside the doorway of the room, while always able to see Ms. Rodriguez. During much of this time, Ms. Rodriguez sat on a bench located inside the room after initially being questioned standing at the table. At no time was Ms. Rodriguez surrounded by numerous Customs officers.

23. Based on the foregoing information detailed above, including the TECS reports regarding Rodriguez, both I and Inspector Harrington suspected that Rodriguez was smuggling narcotics into the United States inside of her alimentary canal.

24. After forming this opinion, we contacted our supervisor, Bernard Der, and informed him that we suspected that Ms. Rodriguez was an internal courier. Inspector Der authorized a patdown of Ms. Rodriguez's outer clothing and instructed us to ask Ms. Rodiguez to

consent to an X-ray that would be conducted at the hospital.

25. Inspector Caroline Tully performed the pat down of Ms. Rodriguez's outer clothing and did not find any narcotics or dangerous instruments on her person. Inspector Tully and I were the only Inspectors present in the room during this patdown.

26. In Spanish, I told Ms. Rodriguez that we suspected her of being an internal courier, specifically telling her that we suspected that she was "carrying narcotics inside your stomach." I told her that we wanted to take her to a hospital in order for a doctor to perform an X-ray to determine if she had narcotics in her body and asked her if she would consent to an X-ray. I gave her a consent form written in Spanish for her to read. See Signed Spanish Consent attached hereto as Exhibit A. Ms. Rodriguez read the consent form. As she was reading the consent form, I asked her if she wanted me to read it to her in Spanish and she said that she did. I then read the consent form word for word in Spanish to Ms. Rodriguez. After I read the consent form to her, Ms. Rodriguez told me that she understood and agreed to sign the consent form. Under her signature, she wrote her name. On the form, I wrote the date, "5/21/04," and the time that Ms. Rodriguez gave her consent by signing the form, "0357." I then signed the form and wrote my identification number. Inspector Tully was present in the Secondary Examination Room with me and Ms. Rodriguez when I asked her to consent to an X-ray. No other Customs Inspectors or other persons were present at that time. Inspector Tully also signed the consent form with her identification number.

27. Attached hereto is an English translation of the Spanish consent form that Ms. Rodriguez signed. See Exhibit B. The consent form contains the following pertinent language, the Spanish translation of which is contained in the consent form signed by Ms. Rodriguez: "I, the undersigned, hereby consent to x-ray examination of my body by a medical facility and/or an X-ray facility designated by the United states Customs and Border Protection. If female, I further consent to a pregnancy test prior to undergoing any X-ray examination. . . . I understand that I have the right to refuse such consent and acknowledge that my consent is freely given and is not the result of any threats, coercion, or other intimidation."

28. Neither I nor any other Customs Inspector or other person coerced, forced, threatened or otherwise intimidated Ms. Rodriguez into consenting to the X-ray. She freely and voluntarily consented to the X-ray.

29. Based upon my interaction with Ms. Rodriguez, my opinion is that she is a 28 year old woman who appears to be of average intelligence and who fully understood my questions, my explanation of the Consent form and that she did not have to give her consent.

30. After Ms. Rodriguez's consent to have an X-ray performed, we again contacted Inspector Der to obtain permission to transport Ms. Rodriguez to the hospital. Customs policy and procedures require that the Port Director authorize the transportation of a passenger to the hospital for any medical procedure, including an X-ray or monitored bowel movement. Inspector Der obtained the Port Director's approval and reported back to us that the transportation of Ms. Rodriguez was approved.

31.  At approximately 5:06 a.m., myself, Ms. Rodriguez and Inspector Tully left for the hospital. At approximately 5:24 a.m., we arrived at the Whidden Memorial Hospital in Everett, MA. At approximately 5:55, an X-ray of Ms. Rodriguez was performed. At approximately 6:11, the results from the X-ray showed that Rodriguez had foreign bodies in her alimentary canal.

32.  During the medical procedures and X-ray conducted at the hospital, Rodriguez was fully cooperative with me and Inspector Tully and with the medical staff at the hospital.

33.  After the results of the X-ray, Ms. Rodriguez stated to me that she had swallowed approximately 60 pellets.

34.  Because of the positive results of the X-ray, Ms. Rodriguez was further detained at the hospital for a monitored bowel movement. At approximately 7:03 a.m., Rodriguez excreted 17 pellets from her body during a monitored bowel movement. A field test performed of the substance contained in one of these pellets tested positive for heroin. From 7:03 a.m. until 5:45 p.m., Rodriguez excreted a total of 60 pellets from her body while at the hospital.

35.  Subsequent laboratory analysis of the substance within these pellets revealed that approximately 585 grams of heroin were contained inside these pellets and smuggled into the country by Rodriguez. A copy of the laboratory analysis is attached hereto as Exhibit C.

36.  Based upon our reasonable suspicion that Ms. Rodriguez was an internal courier, formed based upon the forgoing detailed information, if Ms. Rodriguez did not consent to an X-ray, we would have transported her to the hospital for a monitored bowel movement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 23, 2004.

Colleen E. McDermott
Customs Inspector
Customs and Border Protection