UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>YVELISSE GONZALEZ RODRIGUEZ ) | Criminal No. 04 CR 10220 |

## DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

### I. INTRODUCTION

The defendant, Yvelisse Gonzalez-Rodriguez, is charged with smuggling heroin into the United States in her alimentary canal, stemming from events that occurred on May 21, 2004. The defendant now moves to suppress the fruits of illegal, invasive and non-routine searches of her bowels through both X-ray and physical techniques. The basis of the defendant motion is that there was no reasonable suspicion to detain the defendant, no reasonable suspicion to support the non-routine searches and further that the x-ray consent was not voluntary and lastly, that Inspectors never sought her consent for a physical search of her bowels or bowel movements. The Court should allow the defendant's motion to suppress evidence as fruits of an unlawful search and seizure based on the Inspectors' lack of reasonable suspicion and the absence of defendant's voluntary and valid consent.

## II.   FACTS

On May 21, 2004, at approximately 1:30 A.M., the defendant arrived at Logan International Airport in Boston, Massachusetts, on Air Jamaica flight number 0049 from Montego Bay, Jamaica. Upon entering Terminal E of the Airport, the defendant was stopped and detained by a number of uniformed United States Customs Officials. See, Affidavit of McDermott; Affidavit of Harrington. She was then held and questioned by these United States Customs officials in both English and Spanish, with Customs Officials switching back and forth between languages. See, Affidavit of Colleen McDermott, ¶ 10. (The defendant is a Spanish-speaking, twenty-eight-year-old woman with a seventh grade education. She speaks and understands only a very limited amount of English.) The defendant was detained and questioned in this fashion for another two and a half hours.

At approximately 4:00 A.M., after having been detained and interrogated for over two hours in the middle of the night, the defendant was pat-frisked by Customs Inspectors. See, McDermott Affidavit, ¶¶ 4-25, Harrington Affidavit, ¶¶ 4-16. After having her body patted down, the uniformed United States Customs officials presented the defendant with a written consent form to X-Ray her person. See, McDermott Affidavit, ¶ 26-28; Harrington Affidavit, ¶ 16-17. Inspectors never sought the defendant's consent to search her bowels or her bowel movements. See, McDermott Affidavit, ¶ 26-28; Harrington Affidavit, ¶ 16-18. Moreover, Inspectors never so much as mentioned a bowel search or a monitored bowel movement to the defendant. See, McDermott Affidavit, generally; Harrington Affidavit, generally. Surrounded by numerous United States Customs officials, the frightened defendant signed the consent form after having

been told by Inspectors that they "wanted to take her to the hospital in order for a doctor to perform an X-ray..." See, McDermott Affidavit, ¶ 26. At, or about 5:45 A.M. that morning, the defendant was transported along with Customs Officials to Whidden Memorial Hospital in Everett, Massachusetts, to be X-rayed. See, McDermott Affidavit, ¶ 31; Harrington Affidavit, ¶ 19. At approximately 7:00 A.M., the defendant passed "pellets" which were then tested and found to contain heroin. See, McDermott Affidavit, ¶ 34. Thereafter, the defendant was placed under arrest.

### III. ARGUMENT

#### A. THERE WAS NO REASONABLE SUSPICION TO SUPPORT THE NON-ROUTINE X-RAY AND BOWEL SEARCHES OF THE DEFENDANT.

A "border search" is an exception to the general requirement of probable cause, which must support a search, with or without a warrant, and thus, certain officers of the United States have the authority to stop and search, upon mere suspicion of illegal activity within their jurisdiction, persons and vehicles that cross international borders into the United States. Rodriguez-Gonzales v. United States, 378 F.2d 256 (1967). Under the border exception, a United States Customs official stationed in an international airport would have jurisdiction to search passengers arriving on international flights. United States v. Hill, 430 F.2d 129 (1970). However, this greater search power does not eclipse a person's Fourth Amendment guarantee or relieve the government's burden of proof. Rather, when a 'reasonable suspicion' standard applies, its requirements must be met and must also be demonstrated by the government to the Court. United States v. Roberts, 37

Fed. Appx. 855, 856-857 (2002). <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531, 537 (1985).

To satisfy the reasonable suspicion standard, government agents must support its position with articulable facts that the person or thing to be searched is involved in illegal activity, such as smuggling contraband. <u>See</u>, generally, <u>United States v. Richards</u>, 638 F.2d 765 (1981). A monitored bowel movement is considered a non-routine border search requiring reasonable suspicion. <u>United States v. Montoya De Hernandez</u>, 473 U.S. 531, 541 (1985).

In the instant matter, the government depends upon only *after-the-fact* computer searches (conducted after the defendant was detained) that revealed that the defendant had 1) had a cellular telephone; 2) traveled to St. Maarten three months earlier and had 3) changed her return flight to establish that the defendant was smuggling drugs. However, the defendant's travel itinerary was learned only after the defendant was detained by Customs Inspector Harrington. <u>See</u>, Harrington Affidavit, ¶ 5 In <u>Montoya</u>, <u>supra</u>, the Court found that Customs Officials had reasonable suspicion to suspect that the defendant was smuggling drugs *before detaining her* based on the facts and the circumstances surrounding her trip - the travel itinerary and flight history, including *eight* short trips between Columbia and her the United States, her lack of hotel reservations and her lack of memory on how her ticket was purchased. <u>Id.</u>, at 533-534. The facts and circumstances in the instant case are in sharp contrast to those in <u>Montoya</u>, <u>supra</u>. Here, the defendant's flight history included a mere two trips, and the defendant had a definite destination i.e. her house and family. Moreover, the defendant was forthcoming in how she had purchased her ticket; she told inspectors that she had paid cash for her ticket. The

defendant's frank and honest answer regarding the ticket is a clear contradiction from Inspector McDermott's characterization of her answers as "evasive, misleading and obviously false" See, McDermott Affidavit, ¶ 19. What is more, Customs Inspectors suspected the defendant was an "internal courier" before even so much as questioning her or searching her bags. See, Harrington Affidavit, ¶¶ 5-6

Further, the government claims that the short length of the defendant's stay and lack of cash-money are indicative of drug smuggling via the alimentary canal. However, upon closer and more reasonable review these particulars tie together neatly with the contents of the defendant's luggage, which the government also relies upon as "suspicious". The defendant's luggage contained items, new with tags, which she planned to sell in the United States, namely, clothing and thirteen pairs of shoes. All of these facts establish nothing more than that the defendant traveled to Jamaica to purchase items for resale in the United States.

In summary, the Government contends that Customs Inspectors had reasonable suspicion to conduct non-routine and invasive X-ray and bowel searches of the defendant based on 1) a cellular telephone; 2) a single trip three months prior; 3) a change in plans; 4) newly purchased clothing and 5) a cash poor status. These five facts are slight, generic and do not establish or create a suspicion of internal drug smuggling. However, these facts do combine and set forth a profile of many, if not most travelers. Clearly, no reasonable suspicion to support the non-routine X-ray and bowel searches of the defendant ever existed, as demonstrated by the facts. Therefore, any evidence obtained by the unsupportable and the unlawful searches and seizures of the defendant must be suppressed.

B. **THE DEFENDANT'S CONSENT TO THE X-RAY WAS INVOLUNTARY AS THE PRODUCT OF COERCIVE AND ABUSIVE TACTICS EMPLOYED BY CUSTOMS INSPECTORS.**

Consent searches are an exception to the general requirement search warrant requirement. Schneckloth v. Bustamente, 412 U.S. 218 (1973); United States v. Forbes, 181 F.3d 1 (1st cir. 1999). Case law firmly establishes that the burden rests on the government to demonstrate to the court that the defendant's consent to the search was both voluntary and freely given. Forbes, supra, 181 F.3d at 5. In determining whether consent to search was voluntarily and freely given, a court must examine the totality of the circumstances surrounding consent. United States v. Lattimore, 87 F.3d 647 (1996). It is appropriate to consider the characteristics of the defendant, such as age, maturity, education, intelligence and experience, as well as conditions under which the purported consent to search was given, such as officer's conduct, number of officers present, and duration, location and time of the encounter. Id. In examining all the surrounding circumstances to determine if the consent to search may have been the product of coercion or abusive tactics, the Court must take into account the possibly vulnerable subjective state of the defendant. Schneckloth, supra.

On May 21, 2004 the defendant was detained at the secondary checkpoint by United States Customs Inspectors just after she deplaned Air Jamaica flight 0049 in Terminal E of Logan International Airport at approximately 1:30 A.M. See, Harrington Affidavit, ¶¶ 3-4. The defendant is a Spanish-speaking, twenty-eight year old woman with a seventh grade education. The defendant is unable to communicate in English. Her ability to understand and speak English is extremely limited. At the secondary

checkpoint, the defendant was questioned in English by Inspector Harrington, who sought the Spanish language services of Inspector McDermott when he determined that the defendant could not sufficiently understand English. See, Id., ¶ 6. The defendant was then taken from the terminal into a small examination room. See, Id., ¶ 7. Relieved and expecting to be able to communicate in Spanish with uniformed Customs Inspector McDermott, the defendant was alarmed and became further frightened when Inspector McDermott instead started to question her in English. See, Id., ¶ 9; McDermott Affidavit, ¶¶ 10. The use of English by Inspector McDermott was an abusive tactic that caused the defendant to feel even more vulnerable. This was a situation where this particular Inspector – Inspector McDermott - was brought in to facilitate communication and instead, purposefully used her language skills in a bullying manner. The defendant was questioned in this manner for two and a half hours. She was subjected to a pat-down of her person and multiple searches of her bag.

Finally, at approximately 4:00 A.M., the United States Customs officials presented the defendant with a form and asked her to sign it. She was never specifically advised that she could refuse to do so. The Inspectors requested the defendant submit to the X-rays while they told her that they suspected that she was a drug smuggler. The defendant did not feel free to leave or free to decline to sign the consent form presented to her. The defendant felt forced to sign the consent form in a coercive environment in which she was afraid and vulnerable. Upon examination of the totality of the circumstances surrounding the signing of the consent form, it is obvious that the defendant's consent to the X-ray was not voluntarily and freely given. Instead, the

defendant's signature on the X-ray consent form was the final product of coercive and abusive tactics employed by Customs Officials.

### C. THE DEFENDANT DID NOT CONSENT TO A PHYSICAL SEARCH OF HER BOWELS OR BOWEL MOVEMENTS.

Defendant's consent for bowel search was never sought by Customs Inspectors. See, Affidavits of McDermott and Harrington. Further, the defendant never consented to such an invasive and embarrassing search. Contrary to the Government's argument as demonstrated above, there was no reasonable suspicion to conduct any such non-routine search - bowel or X-ray - without the defendant's consent. See, Argument, supra.

## IV. CONCLUSION

Wherefore, based upon the foregoing, the defendant respectfully requests that this Honorable Court grant her Motion to Suppress evidence unlawfully seized in violation of her Fourth Amendment guarantee to be free from unreasonable search and seizure.

Respectfully submitted,
YVELISSE GONZALEZ-RODRIGUEZ
By her Attorney,

_____
RONALD IAN SEGAL
23 Central Avenue
Suite 605
Lynn, MA 01901
(781) 599-2800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>YVELISSE GONZALEZ-RODRIGUEZ )<br>) | Criminal No. 04 CR 10220 |

### AFFIDAVIT OF DEFENDANT

I, Yvelisse Gonzalez-Rodriguez, duly sworn and subject to the pains and penalties of perjury, do hereby depose and say as follows:

1. I am the defendant charged with importation of heroin, a Schedule I controlled substance, in violation of 21 U.S.C. § 952 (a).

2. On May 21, 2004 at approximately 1:30 A.M., I had deplaned at Logan Airport from a flight originally out of Montego Bay, Jamaica, along with many other passengers.

3. When I initially passed through customs, my carry-on suitcase was thoroughly searched and I was asked a lot of questions in English which I was not able to understand or respond to.

4. My native language is Spanish and I speak and understand very little English. I have never studied the English language.

5. I grew up in the Dominican Republic and went to school through the Seventh grade.

6. After the initial Customs search, two further apparent Customs Agents approached and questioned me. I did not understand what they were saying.

7. My luggage contained a number of pairs of new shoes and clothing with tags still on. I intended to sell them.

8. Thereafter, they took me into a separate room and a third agent entered therein. The agents then searched the contents of my luggage. No drugs were found therein.

9. For the next two and a half (2 1/2) hours, they questioned me, mostly in English. During this time, I felt very tired, frightened and intimidated. Much of the time, the agents were conversing amongst themselves in English which I was unable to understand. This fact made me feel very nervous and emotionally upset. I felt terribly alone and confined.

10. After the passage of all this time, I was presented with a consent form which I did not understand that I could refuse to sign. I was never adised that I had a right to refuse to sign.

11. I have never been previously arrested or detained and do not know what rights belong to me.

12. I never consented to have any internal materials removed from my body or searched.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY.

_____
YVELISSE GONZALEZ-RODRIGUEZ

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

On this __1/18__ day of __APRIL__, 2005, before me, the undersigned notary public, personally appeared __Vicuist Gonzalez-Rodriguez__, proved to me through satisfactory evidence of identification, which were __FACIAL IDENTIFICATION__, to be the person whose name is signed in the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

_____
NOTARY PUBLIC
My commission expires:
2/6/2009